# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **BRUCE ROTHE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 10-0323 (ESH)** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff brings this action under the Social Security Act, 42 U.S.C. § 405(g), seeking a reversal of defendant's decision to deny disability insurance benefits. In the alternative, plaintiff seeks a remand to the Social Security Administration ("SSA") for a new administrative hearing. The issue presented is whether the administrative law judge ("ALJ") based his decision to deny benefits on an adequately developed record that contained substantial evidence to support such a denial. The Court holds that this finding is based on sufficient and substantial evidence in the record. Accordingly, defendant's motion for judgment will be granted and plaintiff's motion for judgment will be denied.

## BACKGROUND

Plaintiff Bruce Rothe is a 59-year-old man who resides in South Australia. He has two bachelor's degrees, two master's degrees, and a doctorate. (Administrative Record ("AR") at 124.) He has prior work experience as an architect and a university lecturer. (AR at 89, 116, 119, 127-29.) On September 28, 2004, plaintiff filed applications for disability insurance benefits alleging that he had been disabled since June 1, 2002, due to multiple chemical

sensitivity ("MCS"). (AR at 17, 83-86.) His claims were denied both initially and upon reconsideration. (AR at 17, 29-32, 36-37.) Thereafter, he received a hearing before an ALJ, who also denied his claims. (AR at 17-26.) The Appeals Council affirmed the decision, thus adopting it as the final decision of the agency. (AR at 9-12.)

## I.     EVIDENCE BEFORE THE ALJ

The evidence before the ALJ consisted of (1) SSA disability and work history reports completed by plaintiff; (2) medical records from several doctors who had treated plaintiff over a twelve-year period; (3) records from Australian social service agencies, including Centrelink and Southern Fleurieu Health Services ("SFHS"), where plaintiff received services; and (4) plaintiff's written statement added to the record at the hearing (from which he was absent).

### A.     Plaintiff's Disability and Work History Reports

In his disability report filed in May 2004, plaintiff reported that he suffered from MCS that limited his ability to work because it caused "brain fog, limb collapse, fatigue due to offactory [sic] and contact with chemicals including print, fragrance, [and] building materials." (AR at 118.) Plaintiff reported that he addressed the symptoms by seeing "dozens of doctors over time" and by changing his profession and activities. (AR at 118, 121.) Plaintiff reported that his MCS was so severe that he had a reaction to the SSA forms because they were "offgasing [sic] chemicals causing brain fog, confusion, blurred vision, and failed hand co-ordination." (AR at 126.) Plaintiff noted the same issue with the work history report forms also filed in May 2004. (AR at 134.)

### B.     Medical Records

Plaintiff's medical records cover a twelve-year span, including records from his primary care physicians, a respiratory specialist, an immunologist, an endocrinologist, and emergency

hospital visits. In addition, his physicians wrote to the SSA explaining that plaintiff was disabled because of his condition.

In 1996, Dr. Douglas McEvoy, a respiratory specialist, diagnosed plaintiff with "mild obstructive sleep apnea" which caused daytime sleepiness that was "objectively not severe, and [was] probably affecting his functional abilities later in the day to a mild degree only." (AR at 169-85.) After attempting various interventions to address plaintiff's sleep apnea, Dr. McEvoy again concluded that it was not severe and made no plans to see plaintiff again. (AR at 169.) Dr. Nick Antic, a physician in Dr. McEvoy's office, saw plaintiff again in August 2003 and reported that plaintiff's sleep apnea was still "very mild," and "given its minimal impact on sleep architecture[, it was] likely to be less significant in him." (AR at 217.)

Plaintiff received psychiatric services from 1996 to 1998. (AR at 256-57, 261-63.) Medical bills indicate that plaintiff saw psychiatrist Dr. Christine Hilton four times between December 1996 and February 1997. (AR at 257.) Receipts show that plaintiff saw psychiatrist Dr. D.J. Rampling in March 1997 and received a prescription for Zoloft. (AR at 256.) Letters show that plaintiff was scheduled to see psychiatrist Dr. Richard Newcombe in July and September 1998. (AR at 261-63.) No treatment notes, formal diagnoses, or other psychiatric records appear in the administrative record. (AR at 256-57, 261-63.)

In May 1998, immunologist Dr. Allan Gale treated plaintiff for allergies. (AR at 189.) Dr. Gale reported that "all skin prick tests for common inhalants and foods were all negative with normal reactivity to histamines," making extrinsic allergy an improbable cause of plaintiff's problems. (*Id.*) Dr. Gale saw plaintiff a year later but did not report a change in his diagnosis. (AR at 187-88.)

At the suggestion of Dr. Gale, plaintiff saw endocrinologist Dr. Ian Chapman in mid-1999. (AR at 191-92.) Tests revealed that plaintiff's blood sugar levels were normal and that he had "neither diabetes nor impaired glucose tolerance." (AR at 191.) Dr. Chapman also explained to plaintiff that there was "no definite evidence" for insulin resistance, a condition plaintiff was concerned he might have. (AR at 192.) Finding plaintiff's condition normal, Dr. Chapman made no plans to see plaintiff again. (*Id.*)

In August 2001, plaintiff began seeing immunologist Dr. David Gillis. (AR at 198.) Dr. Gillis treated plaintiff for vasomotor rhinitis and chronic dry skin but reported that several aspects of both did not have a "particularly . . . good evidence base," urging plaintiff to continue treatment through dietary restrictions. (*Id.*) On a later visit, Dr. Gillis reported that "there does not seem to be any conclusive evidence that diet has given rise to problems." (AR at 197.) In May 2002, immunologist Dr. Frank Kette reported that plaintiff's "nasendoscopy, prick skin testing, and RAST studies" had all been negative and that a surgeon had found a CT scan of plaintiff's sinuses did not show any surgical problems except a septal spur. (AR at 215.) The record includes Dr. Gillis' and Dr. Kette's treatment notes from 2002 through 2006. (AR at 200-10.)

Dr. Bruce Wauchope, plaintiff's current primary care physician, began seeing him in late 2002. (AR at 234.) Plaintiff saw Dr. Wauchope twelve times between June 1, 2002, and June 30, 2003, the period when plaintiff was qualified to receive SSA disability benefits. (AR at 19, 235-38). Dr. Wauchope's notes detail plaintiff's symptoms but also reflect that "[h]e seems to be obsessive about this; I am not sure if he is imagining this." (AR at 235-38.) He also notes that plaintiff was feeling better on several visits throughout 2003. (AR at 237-39.) Dr. Wauchope's records include the results of several rounds of blood work conducted throughout

2002 and 2003 and physical evaluation charts from December 2002 and January 2003. (AR at 240-55, 258-60.) Plaintiff tested positive for rickettsia and Epstein-Barr; the other tests, including those for hepatitis A, B, and C, Lyme disease, Ross River virus, and dengue virus, came back negative. (AR at 240-55.)

Dr. Wauchope wrote two letters to the SSA advocating for plaintiff. The first from 2006 reports that plaintiff has chronic fatigue syndrome ("CFS") and MCS and has been unable to work since December 2000. (AR at 166.) The second from 2008 reports that plaintiff suffers from depression, fibromyalgia, and CFS with chemical sensitivity and that these conditions have rendered him incapable of work since the time Dr. Wauchope started treating him in 2002. (AR at 272.) On July 18, 2006, Dr. Gillis also wrote a letter to the SSA on plaintiff's behalf, writing that plaintiff suffers from CFS and "chemical sensitivity that is managed by avoidance," both of which are so severe "that he was last able to work at the end of 2000." (AR at 270-71.)

Plaintiff made emergency visits to Royal Adelaide Hospital twice for reasons unrelated to the conditions he claims cause his disability. (AR at 193-94, 213.) First, plaintiff was treated for an insect bite to his arm on October 30, 1999. (AR at 193-94.) Second, plaintiff was diagnosed with acute appendicitis, had an appendectomy on July 13, 2001, and was released from the hospital a week later. (AR at 213.)

On July 28, 2005, an SSA Office of Disability ("ODO") physician reviewed the medical records. (AR at 165.) The physician noted plaintiff's condition as "generalized tiredness, lethargy, and fatigue diagnosed as chronic fatigue syndrome" and MCS managed by avoidance of aggravating agents. (*Id.*) However, the physician reported that "[t]here are no objective findings to document the presence of a severe impairment" during the time plaintiff qualified for benefits. (*Id.*)

### C. Australian Social Service Records

Plaintiff receives a Disability Service Pension from Australian agency Centrelink and living assistance organized by a social worker through Australian agency SFHS. (AR 106-07, 219-33.) Plaintiff submitted several records generated by both agencies.

The Centrelink records include several forms generated during plaintiff's application process for assistance from that agency. (AR at 109-16, 147-64.) The first is a Centrelink Treating Doctor's Report completed by Dr. Gillis on August 19, 2003. (AR at 157-63.) The report diagnoses plaintiff with MCS, CFS, and vasomotor rhinitis. (AR at 158, 160.) The form notes that each condition is "presumptive" rather than "confirmed." (*Id.*) The second form is a Centrelink Medical Assessment Report completed by Dr. Mark Yeager on September 18, 2003. (AR at 147-56.) Dr. Yeager notes that plaintiff has MCS and CFS, both formally diagnosed in 1998, and lists several symptoms created by those conditions. (AR at 150.) The report also notes that plaintiff will be able to work no more than seven hours a week for at least two years. (AR at 151.) Finally, plaintiff includes his Centrelink application form that reflects the same self-reported medical information plaintiff reported on his SSA disability report. (AR at 109-16.)

The SFHS records note plaintiff's history of services with that agency. (AR at 219-33, 273.) An initial assessment report completed on November 10, 2003, notes that plaintiff suffers from MCS, which "does not follow any injury or illness." (AR at 224.) SFHS treatment notes detail the services plaintiff received from SFHS, including counseling from his social worker Chris Procter, weekly help with laundry, and diet-planning with a dietician. (AR at 227-33.) Finally, a letter from Procter notes that plaintiff "has supplied documentation that clearly states a diagnosis of: Depression, Fibromyalgia, Chronic Fatigue Syndrome, and Chemical Sensitivity." (AR at 273.)

### D.  Plaintiff's Written Statement

Plaintiff did not travel from his home in South Australia to the ALJ hearing in Hawaii for fear that he would be exposed to chemicals that would exacerbate his MCS.  (AR at 58, 80, 276.)  At the hearing, plaintiff was represented by Alison St. John, a paralegal/advocate with the Legal Aid Society of Hawaii.  (AR at 80, 276.)  In lieu of testimony, St. John submitted a written statement by plaintiff to the ALJ.  (AR at 138-46, 276-77.)  In the statement, plaintiff notes that he suffers from an extreme lack of energy and lethargy but does not mention MCS or any other medical condition.  (AR at 145-46.)

The majority of the statement details the life changes plaintiff has made due to his poor health.  (AR at 138-46.)  Plaintiff reports that he quit his job as a full-time architect and moved to South Australia in hopes that the "pure, remote, arctic air" would help his condition.  (AR at 139.)  He lectured first at the University of Adelaide and then at the University of South Australia in hopes that both university's "chemical-free policies" would help his condition, but they did not.  (*Id.*)

Plaintiff reports that he currently lives "in a remote area of bushland believed to be particularly good in air quality" and chemical-free.  (AR at 141.)  In order to avoid chemical exposure, his dwelling consists of two ten-foot by ten-foot metal garden sheds that, along with his mattress and linens, have been "off-gased [sic]."  (AR at 141-42.)  He has no electricity or running water and notes that he receives help from SFHS.  (AR at 143-44.)

## II.  THE ALJ'S DECISION

After consideration of the evidence, the ALJ denied benefits.  (AR at 17.)  The ALJ found that plaintiff did not have a severe impairment that limited his ability to work during the time he qualified for benefits from June 1, 2002, to June 30, 2003.  (AR at 19.)  Although plaintiff's conditions could have caused his reported symptoms, the ALJ weighed the medical

evidence and found that the severity of plaintiff's conditions was uncorroborated by objective medical evidence. (AR at 24.) Without that evidence to buttress the opinion of plaintiff's physicians, the ALJ gave more weight to the ODO physician's assessment that plaintiff did not have a severe condition that limited his ability to work. (*Id.*) In the alternative, the ALJ found that plaintiff was capable of doing his past relevant work. (AR at 25.)

## A. Plaintiff's Medical Conditions

Addressing each condition, the ALJ found "few actual exam findings or objective medical evidence" to corroborate medical records which mainly reflected plaintiff's subjective view of his symptoms. (AR at 22, 24-25.) The ALJ focused on plaintiff's claimed condition, MCS, but also addressed plaintiff's sleep apnea and depression.

### 1. MCS/CFS

The ALJ found that plaintiff's MCS and CFS were treated conservatively and neither was corroborated by actual exams or objective evidence. (AR at 25.) Although various medical reports noted that plaintiff began suffering from MCS and CFS in 1997 or 1998, no evidence showed an actual diagnosis of those conditions. (AR at 22, 24-25.) Despite the record reporting a litany of symptoms associated with the conditions including various allergies, fatigue, and brain fog, the objective medical evidence did not show that any of those symptoms was severe enough to significantly limit plaintiff's ability to function. (AR at 22, 25.)

In order to find a basis for the diagnosis, the ALJ reviewed all of Dr. Wauchope's treatment notes for those visits that occurred while plaintiff was qualified for benefits. (AR at 22.) The ALJ attacked the notes for lack of objective medical evidence, saying that they "primarily recite the claimant's subjective report of his symptoms." (*Id.*) Further, the ALJ noted that Dr. Wauchope himself expressed doubt about plaintiff's symptoms by writing, "I'm not sure if he's imagining this." (*Id.*) Where the record did contain objective medical evidence in the

form of the blood tests ordered by Dr. Wauchope, most came back negative. (*Id.*) For those that came back positive, including the test for rickettsia (a bacteria), the physician prescribed medication and did not mention them in subsequent notes. (*Id.*) Finally, the ALJ noted that Dr. Wauchope suggested that plaintiff had a disability that qualified him for government assistance in spite of both the objective medical evidence and the physician's personal doubt about plaintiff's condition. (*Id.*)

The ALJ dismissed other opinions as conclusory in nature, noting that medical assessments were reserved for physicians while disability assessments were reserved for the SSA. (AR at 24.) The ALJ noted that Dr. Gillis' opinion was unsupported by evidence and that Dr. Yeager's Centrelink reports required him to provide little information beyond "checking boxes." (*Id.*) The ALJ disregarded the SFHS paperwork on two grounds: it was non-medical because it was generated by a social worker and the records postdate the period when plaintiff qualified for benefits. (AR at 23.)

The ALJ did use objective medical evidence, however, to undermine the diagnosis. In May 2002, Dr. Kette treated plaintiff and reported that avoidance of allergens helped manage his symptoms. (AR at 21.) In 2003, Dr. Gillis treated plaintiff and did not report any clinical findings or evidence to corroborate plaintiff's symptoms. (AR at 23.) Addressing plaintiff's endocrine system as a possible cause of his condition, a series of tests by an endocrinologist in 1999 and 2000 showed that plaintiff's insulin levels were normal and that plaintiff had no sign of diabetes. (AR at 21.)

### 2. Sleep Apnea

The ALJ found that plaintiff's sleep apnea was not severe enough to impair his ability to function. (AR at 25.) Summarizing plaintiff's visits to Dr. McEvoy in 1996 and 1997 and to Dr. Antic in 2003, the ALJ noted that each doctor found mild problems that resulted in only marginal

impairment to plaintiff.  (AR at 21-23.)  The ALJ also pointed to Dr. Wauchope's notes from October 3, 2003, that reported that plaintiff's sleep was improving.  (AR at 23.)

### 3. Depression

The ALJ found that the record contained no objective evidence that plaintiff was ever diagnosed with depression.  (AR at 25.)  The ALJ noted that plaintiff received various psychiatric services from 1996 to 1998 and a prescription for Zoloft in 1997.  (AR at 21.)  However, no evidence existed that plaintiff received treatment or medication for depression during the time he qualified for benefits between June 2002 and June 2003.  (AR at 21, 25.)

### B. Past Relevant Work

In the alternative, the ALJ found that plaintiff was capable of activity that was consistent with his past relevant work as a lecturer.  (AR at 25.)  The ALJ reasoned that work congruous to a position as a lecturer would involve minimal exposure to those pollutants that aggravated plaintiff's condition.  (*Id.*)  Without objective medical evidence proving the degree of plaintiff's reaction to environmental factors, the ALJ reasoned that plaintiff had not proven that his disability would prevent him from working in an occupation with minimal exposure to pollutants.  (*Id.*)

## ANALYSIS

## I. STANDARD OF REVIEW

### A. Scope of Review

A district court is limited in its review of the SSA's findings to a determination whether those findings are based on substantial evidence.  42 U.S.C. § 405(g); *Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004); *Poulin v. Bowen*, 817 F.2d 865, 870 (D.C. Cir. 1987).  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation

omitted), requiring "more than a scintilla, but . . . something less than a preponderance of the evidence." *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010) (citation omitted). A court must "carefully scrutinize the entire record" but may not reweigh the evidence or supplant the SSA's judgment of the weight of the evidence with its own, only reviewing whether the ALJ's findings are based on substantial evidence and whether the ALJ correctly applied the law. *Butler*, 353 F.3d at 999; *Davis v. Shalala*, 862 F. Supp. 1, 4 (D.D.C. 1994); *Davis v. Heckler*, 566 F. Supp. 1193, 1195 (D.D.C. 1983). Finally, substantial deference should be given to the ALJ's decision, but the evidence should be read in the light most favorable to the claimant. *See Davis v. Shalala*, 862 F. Supp. at 4.

### B.    Legal Framework for Determining Disability

In order to qualify for disability insurance benefits, an individual must prove that he has a disability that renders him unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" for a period of "not less than 12 months." 42 U.S.C. §§ 423(a)(1) & (d)(1)(A). The claimant must support his claim of impairment with "[o]bjective medical evidence" that is "established by medically acceptable clinical or laboratory diagnostic techniques." 42 U.S.C. § 423(d)(5)(A). In addition, the impairment must be severe enough to prevent the claimant from doing his previous work and work commensurate with his age, education, and work experience that exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The SSA uses a five-step evaluation process to determine whether a claimant is disabled, thus qualifying for benefits. 20 C.F.R. § 404.1520(a)(1). A clear determination of disability or non-disability at any step is definitive, and the process ends at that step. 20 C.F.R. § 404.1520(a)(4). In the first step, a claimant is disqualified if he is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). In the second step, a claimant is

disqualified if he does not have a "severe medically determinable physical or mental impairment" that is proven "by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1508 & 404.1520(a)(4)(ii). In the third step, a claimant qualifies for benefits if his impairment(s) meets or equals an impairment listed in 20 C.F.R. § 404, subpart P, appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). Between the third and fourth step, the SSA uses the entire record to make a determination of the claimant's residual functional capacity ("RFC"), which is "the most [the claimant] can still do despite [the] limitations" created by the impairment. 20 C.F.R. §§ 404.1520(a)(4) & 404.1545(a)(1). In the fourth step, a claimant is disqualified if his RFC shows that he is still able to do his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). In the fifth step, a claimant is disqualified if his RFC shows that he is capable of adapting to "other work that exists in the national economy." 20 C.F.R. §§ 404.1520(a)(4)(v) & 404.1545(a)(5)(ii). If the claim survives these steps, then the claimant is determined disabled and qualifies for benefits. 20 C.F.R. § 404.1520(a)(4)(v).

In this case, the ALJ found that plaintiff's claim failed at Step Two, or, in the alternative, failed at Step Four. At Step One, the ALJ found that plaintiff was not engaged in substantial gainful activity during the time he qualified for benefits, thus moving to Step Two. (AR at 19.) At Step Two, the ALJ found that plaintiff "did not have an impairment or combination of impairments" that would qualify for disability insurance benefits. (*Id.*) Although the ALJ found that plaintiff had a history of CFS, MCS, and sleep apnea, he determined that the objective medical evidence did not support a finding that any of those conditions was severe. (AR at 19-25.) The ALJ pointed to a number of medical tests and physician treatment notes that failed to substantiate the severity of plaintiff's conditions. (AR at 20-25.) In the alternative, the ALJ

found that plaintiff's claim would have failed at Step Four because the evidence suggested that plaintiff was capable of his past relevant work as a lecturer.  (AR at 25.)

## II.    REVIEW OF ALJ'S DECISION

Plaintiff raises three challenges to the ALJ's decision.  First, plaintiff contends that the ALJ failed in his duty to properly develop a complete administrative record that could be used to conclusively determine whether plaintiff had a disability.  (Memorandum in Support of Plaintiff's Motion for Judgment of Reversal ["Pl.'s Mem."] at 3-7.)  Specifically, plaintiff argues that the ALJ had an affirmative duty to contact plaintiff's doctors because the record was inadequate to make a determination of disability.  (*Id.* at 4-5.)  Second, plaintiff argues that the ALJ was erroneous in determining that plaintiff did not have a severe disability at Step Two of the evaluation process because the "severity" requirement is a *de minimis* standard, the ALJ under-relied on plaintiff's physicians, and the ALJ over-relied on the ODO physician.  (*Id.* at 7-9.)  Third, plaintiff claims that the ALJ erroneously determined that plaintiff was capable of doing his past relevant work at Step Four by failing to make a finding as to either plaintiff's RFC or the demands of plaintiff's past work as a lecturer.  (*Id.* at 10-11.)

### A.    The ALJ's Decision was Based on an Adequate Record

"[A]n administrative law judge has the affirmative duty to investigate fully all matters at issue and to develop the comprehensive record requisite for a fair determination of disability." *Poulin v. Bowen*, 817 F.2d 865, 870 (D.C. Cir. 1987); *see also Krishnan v. Barnhart*, 328 F.3d 685, 695 (D.C. Cir. 2003); *Turner v. Astrue*, 710 F. Supp. 2d 95, 108 (D.D.C. 2010); *Gurrola v. Astrue*, 706 F. Supp. 2d 78, 85 (D.D.C. 2010).  This duty is magnified when the claimant is not represented by an attorney.  *Poulin*, 817 F.2d at 870.  The ALJ has an obligation to develop a "complete medical history" that contains medical records covering the relevant period of disability.  20 C.F.R. § 404.1512(d); *see also Poulin*, 817 F.2d at 870-72, 876 (remanding a

claim in part because the ALJ failed to request records for a nineteen-month gap during claimant's qualifying period).

This duty compels the ALJ to contact the claimant's physicians to resolve any conflicts in the record if resolving the conflict is a necessary condition for deciding the claim. 20 C.F.R. § 404.1512(e); *see also Turner*, 710 F. Supp. 2d at 108 ("the ALJ need not undertake an additional investigation where there is no obvious gap or defect in the administrative record" or resolve conflicts whose resolution is immaterial to the ALJ's determination); *Gurrola*, 706 F. Supp. 2d at 86 (noting the duty does not exist "when . . . conflicts between the physician's opinions and other substantial evidence in the record convince the ALJ that those opinions should not be given controlling weight").

Plaintiff contends that the ALJ had an affirmative duty to contact plaintiff's treating physicians to obtain additional medical records because "the evidence received from [plaintiff's] treating physicians was inadequate to determine whether [he] was disabled." (Pl.'s Mem. at 4-7.) Plaintiff further contends that this duty was heightened because he was not represented by counsel. Plaintiff's argument fails because the record was adequately developed.

First, the record contains no critical gaps in medical information. For the thirteen-month period during which plaintiff was qualified for benefits, the record included: (1) Dr. Wauchope's treatment notes for twelve visits; (2) the results of twenty-seven blood tests ordered as a result of those visits; (3) the prescriptions showing what medication plaintiff received as a result of those visits; (4) nine physical evaluation charts from December 2002 and January 2003 visits; and (5) Dr. Gillis' treatment notes for five visits. (AR at 202-07, 234-38, 240-53, 258-60, 264-67.) For the twelve month periods before and after plaintiff was qualified for benefits, the record included: (1) Dr. Wauchope's treatment notes for eight additional visits; (2) the results of five

additional blood tests; (3) a letter from Dr. Antic diagnosing plaintiff with minor sleep apnea; (4) the chart from plaintiff's appendicitis; (5) Dr. Kette's assessment of plaintiff's condition after plaintiff's nasendoscopy, prick skin testing, and RAST studies all came back negative; and (6) Dr. Gillis' treatment notes for nine additional visits. (AR at 199-210, 213, 215-17, 238-39, 253-55, 268.)

Second, the record contains enough evidence to make a fair, objective assessment about plaintiff's claim. As Part II.B of this Memorandum Opinion explains, the ALJ relied on objective, medical evidence to affirmatively show that plaintiff's condition was not medically severe enough to qualify for disability benefits. Plaintiff argues that the record was "inadequate to determine whether [plaintiff] was disabled," (Pl.'s Mem. at 5) but he fails to explain how the record was deficient, detail the specific evidence that the ALJ should have requested, or show how any additional evidence would have created a different result. There is a difference between a record inadequate to determine whether the claimant is disabled and a record that fails to prove that the claimant is disabled. Plaintiff mistakes the latter for the former and seeks to force the ALJ to request additional medical information until he finds a disability. The law, however, allows the ALJ to stop the inquiry before that point if the record is free of crucial gaps and objective medical evidence disproves the claim. *See* 20 C.F.R. § 404.1512(e) (compelling the ALJ to fill gaps in the record if they are critical to deciding the claim); 20 C.F.R. § 404.1520(a)(4) (requiring the five-step evaluation process to end on any step where a determination of non-disability is made); *see also Turner*, 710 F. Supp. 2d at 108 (explaining that the ALJ's duty to develop the record does not compel the ALJ to seek additional evidence if the record allows him to make a fair decision).

Third, the record as it stands, which contains no critical gaps and an abundance of objective medical evidence, satisfies any duty by the ALJ to develop the record when a claimant is not represented by counsel. In addition to not articulating where the record could have been expanded, plaintiff offers no explanation of what the heightened duty means or how it could have helped him. (Pl.'s Mem. at 4.)

### B. The ALJ's Determination that Plaintiff was not Severely Disabled is Supported by Substantial Evidence

Plaintiff makes three arguments to prove that the ALJ erred at Step Two. First, plaintiff argues that the ALJ erroneously rejected the opinions of "every treating and examining health care provider . . . [who] all . . . concurred that [plaintiff] did in fact suffer from CFS and MCS." (Pl.'s Mem. at 9.) Although plaintiff correctly asserts that the ALJ must, at times, give deference to the claimant's treating physicians, plaintiff is incorrect both in his assessment of the conviction behind his physicians' diagnoses and the degree of deference which the ALJ must give to his treating physicians.

An ALJ must give deference to the claimant's treating physician(s) unless the assessment of that physician(s) is not supported by objective medical evidence or is contradicted by substantial evidence in the record. 20 C.F.R. 404.1527(d)(2); *Poulin*, 817 F.2d at 873; *Turner*, 710 F. Supp. 2d at 105-06. Specifically, contradictions between a physician's treatment notes and his assessment of the claimant's disability can mitigate the deference the ALJ must give the physician. *Turner*, 710 F. Supp. 2d at 106. In the present case, the ALJ determined that the treating physicians were not credible based on substantial evidence. He found that the objective medical evidence, including numerous blood tests, evaluation charts, allergy tests, sleep apnea tests, and endocrinology tests, indicated that plaintiff's condition was not severe. (AR at 21-25.) He also found that Dr. Wauchope, plaintiff's primary physician during the period plaintiff

qualified for benefits, contradicted his conclusory opinion that plaintiff was disabled by MCS and CFS with treatment notes including "I'm not sure if he is imagining this" and frequent references to plaintiff's improvement. (AR at 22.) Because the ALJ could point to numerous objective medical records and physician treatment notes that contradicted the physicians' general assessment that plaintiff was disabled, the ALJ did not need to accord deference to those physicians' opinions.

Second, plaintiff argues that the ALJ erroneously relied on the opinion of the ODO physician, as opposed to plaintiff's physicians. (Pl.'s Mem. at 9.) The ALJ's opinion, however, suggests otherwise. Whereas the ALJ's analysis of plaintiff's medical records and various physicians occupies nearly five pages in the Administrative Record, the ALJ's assessment and analysis of the ODO's opinion takes up only two sentences. (AR at 21-25.) As the analysis above shows, the ALJ relied heavily on the objective medical evidence and contradictory treatment notes provided by plaintiff to reject his claim. Having given an appropriate level of deference according to the treating physician rule, the ALJ then relied on the ODO physician's opinion which coincided with his own that "there were no objective medical findings documenting the presence of a severe impairment." (AR at 24.)

Third, plaintiff argues that the severity requirement of the "severe impairment" standard at Step Two is only a *de minimis* standard that should not bar plaintiff from recovering benefits. (AR at 8.) To support this claim, plaintiff cites Social Security Ruling ("SSR") 85-28, which states in part: "If an adjudicator is unable to determine clearly the effect of an impairment . . . on the individual's ability to do basic work activities, the . . . evaluation process should not end with the not severe evaluation step." SSR 85-28, 1985 WL 56856 (1985).

Plaintiff fails to prove that the ALJ was unable to determine clearly if plaintiff's impairment affected his ability to work, a necessary condition for the severity requirement to become a *de minimis* standard. The ALJ was able to rely upon existing objective medical evidence to determine that plaintiff's actual, medical symptoms were substantially less severe than the symptoms plaintiff claimed he was suffering. (AR at 19-25.) This determination by the ALJ is consistent with the regulations, 20 C.F.R. §§ 404.1508 & 404.1520(a)(4)(ii), and SSR 85-28, which states, "[a] claim may be denied at step two only if the evidence shows that the individual's impairments . . . are not medically severe." SSR 85-28, 1985 WL 56856 (1985).

### C. The ALJ's Determination that Plaintiff was Capable of Past Relevant Work at Step Four is Superfluous

The five-step evaluation process ends on any step that determinatively proves that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4). Accordingly, when the ALJ found that plaintiff was not disabled at Step Two (AR at 19-25), his inquiry should have stopped there. Although plaintiff argues that the ALJ's finding at Step Four is erroneous (Pl.'s Mem. at 10-12), this Court's decision to affirm the ALJ's finding at Step Two makes Step Four unnecessary to analyze.

### CONCLUSION

The ALJ's determination that plaintiff did not suffer a severe impairment at Step Two of the evaluation process is supported by substantial, objective medical evidence from an adequately developed administrative record. The ALJ properly identified the evidence he based his decision upon and fulfilled his duty to make a decision based upon adequate record evidence. Whereas the evidence indicated that plaintiff's impairments were not medically severe, the ALJ also gave proper weight to the treating physicians' opinions that plaintiff was disabled.

Therefore, the Court will deny plaintiff's motion for reversal and grant defendant's motion for affirmance. A separate order accompanies this Memorandum Opinion.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   February 22, 2011